| | |
|---|---|
| ROBERT RYUICHI MITSUGI,<br><br>      Petitioner,<br><br>vs.<br><br>EUNJI JUNG,<br><br>      Respondent. | **JOINT EXPERT REPORT<br>REGARDING JAPANESE LAW**<br><br><br><br>Civil No.: 1:22-cv-08025-LGS<br><br>The Honorable Lorna G. Schofield |

Daniel Young and Kaoru Haraguchi,[1] (together, "Experts") submit this Joint Expert Report Regarding Japanese Law ("Joint Report") in accordance with the Court's Order, dated March 13, 2023, ECF No. 46. This Joint Report[2] describes what rights Petitioner had after Respondent was appointed as the sole custodian[3] of the children under Japanese law.

## I. INFORMATION REVIEWED

Mr. Haraguchi reviewed the material listed below and exchanged e-mails and met with Mr. Mitsugi's counsel as well as Petitioner Robert Mitsugi.

Mr. Young relied on the following material and met with Ms. Jung and her Japanese counsel in the divorce proceedings: Japan Civil Code Provisions cited in this Report (Japanese and English); The Hague Convention on Child Abduction (Japanese and English); the Amended

---

[1] Curricula vitae for the Parties' respective experts are attached as Exhibits 1 and 2.

[2] The exhibits referenced in the joint portion of the report and Mr. Young's portion of the report are attached to the Declaration of Kathleen Young in Support of Daniel Young's Individual and Joint Expert Opinions. The exhibits referenced in Mr. Haraguchi's portion of the report are attached to the Declaration of Imani C. Tisdale in Support of Joint Expert Report Regarding Japanese Law.

[3] I, Kaoru Haraguchi, object to the use of "sole custodian". The term "sole custodian" does not exist under Japanese law. The various complexities of child custody under Japanese law are further elaborated below in the joint opinion, as well as my independent opinion also found below.

Petition, Petitioner's Hague Convention Claims (Japanese and English); Mr. Kim's Opinion Letter (Japanese and English); Ms. Jung's Residency Certificate (Japanese and English); Japanese Court Inspector's Due Diligence Report (Japanese and English); Emails and Faxes cited in this Report; Japan's Family Registration System (U.S. Department of State); the Court's Docket for this case; Act on General Rules for Application of Laws; Secondary Sources cited in this Report; Guide to the Family Court of Japan Revised Edition 2022, Child Abduction and Article 224 of the Criminal Code, by Kaoru Haraguchi; ICLG, Family Law 2022 and 2023 Practical Cross-border Insights into Family Law.

## II.    SUMMARY OF FACTS

*Mr. Mitsugi and Ms. Jung marry and grow their family*

1.    Mr. Mitsugi and Ms. Jung were married in New York on July 5, 2013. *See* Due Diligence Report, p. 4 ("Due Diligence Report") (English translation attached as Exhibit 3, original Japanese attached as Exhibit 4).

2.    KLM was born in New York in 2015.[4] *See id.* at p. 4.

3.    The family then moved to Japan in June of 2015. *See id.*

4.    KLM became a Japanese resident on June 27, 2015. *See* Resident Certificate, p. 2 (English Translation attached as Exhibit 5, original Japanese attached as Exhibit 6).

5.    Ms. Jung became a foreign resident in Japan on June 6, 2016. *See id*. at p. 1.

6.    In March of 2017, Ms. Jung went to South Korea in preparation for giving birth to Mr. Mitsugi's and Ms. Jung's second child, RHM. *See* Due Diligence Report, p. 5 (Exhibit 3).

7.    RHM was born in South Korea in 2017. *See id.*

---

[4] This Joint Report identifies the Children only by initials and year of birth.  FED. R. CIV. P. 5.2.

8. RHM became a resident of Japan on the same day. *See* Resident Certificate, p. 3 (Exhibit 5).

9. Ms. Jung returned to Japan with the children in July of 2017. *See* Due Diligence Report, p. 5 (Exhibit 3).

*Problems in Mr. Mitsugi's and Ms. Jung's marriage*

10. In August of 2019, Ms. Jung stayed in a hotel after an argument regarding Mr. Mitsugi's debts. *See* Due Diligence Report, p. 6 (Exhibit 3).

11. Mr. Mitsugi and Ms. Jung separated in September of 2019. *See id*.

12. Mr. Mitsugi lived at his younger sister's home, while Ms. Jung lived with the children at the marital home. *See id*.

13. Beginning in February of 2020, Mr. Mitsugi and Ms. Jung returned to living together in their marital home, although they had separate bedrooms. *See id*.

14. On March 22, 2020, Mr. Mitsugi and Ms. Jung were arguing and Ms. Jung called the police. With police mediation, it was decided that Ms. Jung would spend the night at a hotel. *See id*.

15. The next day, Mr. Mitsugi called the police saying that Ms. Jung abducted the children when she picked them up from preschool. *See id*.

16. The children were placed in a children's welfare center because Mr. Mitsugi and Ms. Jung would fight in ways that included physical violence in front of the children. *See id*.

*Divorce proceedings in Japan*

17. Family court investigators were appointed on June 18, 2020. *See* Due Diligence Report, p. 1 (Exhibit 3).

18. The investigators interviewed Mr. Mitsugi, Ms. Jung, KLM, RHM, and employees at the children's schools. *See id*. at pp. 1–2.

19. The investigators recommended that Ms. Jung be appointed as the children's guardian (*kango-sha*). *See id*. at p. 20.

20. Mr. Mitsugi and Ms. Jung agreed to appoint Ms. Jung as the custodian (*kango-sha*) of the children in a mediation held with a mediation panel of the Chiba Family Court on August 13, 2020 ("Mediation Agreement") until the divorce is finalized or the parties live together again. *See* Mediation Agreement, ¶ 1 (Certified English translation attached as Exhibit 7, original Japanese attached as Exhibit 8).

21. It was also agreed in the Mediation Agreement that Mr. Mitsugi would have visitation with the children with the number of visits, dates, locations, methods, and other details of the visitation to be agreed to by the parties. *See* Mediation Agreement, ¶ 3 (Exhibit 7).

22. The divorce in Japan has not been finalized and it is unknown when it might be finalized.

*Ms. Jung comes to the United States and Hague Convention procedures initiated*

23. Ms. Jung notified Mr. Mitsugi she would be moving with the children to the United States in emails in November 2021 and in a meeting on December 3, 2021. *See* Emails JUNG_000583-JUNG_000585, attached as Exhibit 9 and Fax, JUNG_00598-JUNG_000603, attached Exhibit 10.

24. Despite Mr. Mitsugi's explicit disagreement with the children leaving Japan, Ms. Jung moved with the children to the United States in January of 2022 without the consent of Mr. Mitsugi. *See* Emails JUNG000583-JUNG_000585 (Exhibit 9).

25. Since the children moved to the United States, Mr. Mitsugi has occasionally participated in online visitation with the children via video or phone calls.

26. Mr. Mitsugi filed a Hague Convention application with the Minister of Foreign Affairs on January 19, 2022.

27. The instant case was filed on September 20, 2022. *See* Court Docket.

### III.    JOINT OPINION

Mr. Haraguchi and Mr. Young provide the following joint opinion:

### A. Parental Authority (*Shinken*), Right of Custody (*Kangoken*), and Visitation (*Menkai-kōryū*) under Japanese Family Law

Japan has a civil law legal system based on six legal codes referred to as Roppō (六法). The six legal codes are the Constitution, the Civil Code, the Code of Civil Procedure, the Criminal Code, the Code of Criminal Procedure, and the Commercial Code. Family law is governed under Parts IV and V of the Civil Code (Minpō).

As detailed below, the Civil Code provides that married parents exercise parental authority (*shinken*) over their children jointly. *See* Civil Code, Art. 818.[5] Upon divorce, only one parent can exercise parental authority (*shinken*). As applied to this case, once the divorce of Mr. Mitsugi and Ms. Jung is finalized in Japan, only one of them will exercise parental authority (*shinken*) over the children. However, the divorce in Japan is not finalized. This case involves the period between separation and divorce.

Because the divorce has not been finalized, both parents still have parental authority (*shinken*). However, as the parents are separated, practicalities require that one parent care for the children day-to-day. In these situations, typically one parent is given custody rights (*kangoken*) until the divorce is finalized and parental authority (*shinken*) is vested in just one parent.

In this case, one parent (Ms. Jung) has been designated as the custodian (*kango-sha*) of the children and one parent (Mr. Mitsugi) has been granted visitation (*menkai-kōryū*).

The experts differ in their opinions on whether visitation (*menkai-kōryū*) is considered a custody right (*kangoken*) under Japanese law during the period of separation.

---

[5] Copies of the applicable Civil Code Provisions with tentative translations from the Japanese Government are attached as Exhibits 11 and A.

### B.  The Relationship Between Parents and Children During Marriage

Chapter IV of Part IV of the Civil Code governs the relationship between parents and children while the parents are married. Chapter IV is titled, "Parental Authority." The Japanese term used in this Chapter of the Civil Code for "parental authority" is *shinken* (親権).[6] Article 818(1) provides that children who have not attained the age of majority (18)[7] are subject to the "parental authority" or *shinken* of their parents. Further, Article 818(3) provides that "parental authority" or *shinken* is exercised jointly by married parents unless one parent is incapable of exercising "parental authority."

The Code sets forth the different rights and duties encompassed within "parental authority" or *shinken*. A person who exercises parental authority has the right to administer the property of the child (Article 824 of the Civil Code); the right to consent to juridical acts of the child (Article 5 of the Civil Code); the right to care for and educate the child (Article 820 of the Civil Code); the right to determine the residence of the child (Article 821 of the Civil Code); the right to discipline the child (Article 822 of the Civil Code); and the right to permit the child to have an occupation (Article 823(1) of the Civil Code).

In this case, it is undisputed that both parties were entitled to jointly exercise the above-numerated six rights and duties of parental authority (*shinken*) while they were living together.

### C.  Parental Authority and Custody When Parents Are Separated Prior to Divorce

Under the Civil Code, parental authority (*shinken*) is shared by the parents until divorce. After divorce, only one parent is given parental authority (*shinken*). However, the parents share parental authority (*shinken*) during the period between separation and the finalization of the

---

[6] This term is made up of two kanji characters, "親" which means "parent" and "権" which means "authority," "power," or "rights.")

[7] Civil Code, Art. 4. (Exhibits 11, A).

divorce. While both parents have parental authority (*shinken*) during separation, practicalities require that one parent has custody of the children and the ability to care for the children day-to-day. But the Civil Code does not have any articles that specifically address "custody" when parents are separated prior to the finalization of divorce proceedings. Additionally, there are no statutory requirements in relation to the rights of custody or visitation rights before the divorce under the laws of Japan. Recognizing this gap, Japanese courts have interpreted Article 766 to apply to the period of separation as well as after divorce.[8] Article 766 provides:

> (Determination of Matters regarding Custody of Child after Divorce etc.)
> (1) If parents' divorce by agreement, the matters of who will have custody over a child, visitation and other contacts between the father or mother and the child, sharing of expenses required for custody of the child and any other necessary matters regarding custody over the child shall be determined by that agreement. In this case, the child's interests shall be considered with the highest priority.
>
> (2) If the agreement set forth in the preceding paragraph has not been made, or cannot be made, the matters set forth in the preceding paragraph shall be determined by the family court.[9]

Thus, under Article 766, the parties and the court can determine who has custody of the children, visitation, and other issues related to custody during the period of separation. In the typical case, one parent is given custody rights or *kangoken*.

Custody Rights (*kangoken*) are not defined in the Civil Code and the term *kangoken* does not appear in the Civil Code. In the Articles cited above detailing parental authority

---

[8] Saikō Saibansho [Sup.Ct.] May 1, 2000, Hei 12 (kyo) no.5, 54(5) Saikō Saibansho minji hanreishū [Minshū], 1607 (Japan) (Exhibit 14). *See also e.g.*, Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 217, 201-02 (explaining that "[a]lthough, literally, Article 766 of the Civil Code only provides for a determination of kangoken in the context of divorce, the courts have extended its application to cases involving separation" and later adding: "It should be noted at the outset that the Civil Code only really addresses the parent-child relationship within the framework of marriage and divorce. … And since many of the most difficult child custody and visitation issues arise while parents are estranged but still legally married, courts have dealt with these cases by effectively amending the clear wording of the Civil Code through interpretation.") (Exhibit 15).

[9] Japan Civil Code, Article 766. Here, the word "*kango* (監護)" is translated as "custody." Compare to Article 820 where "*kango* (監護)" is translated as "care." (Exhibits 11, A).

(*shinken*), only Article 820 contains the word *kango*, which is the root of *kangoken*.[10] The tentative translation from the Japanese government for Article 820 provides as follows:

> (Right and Duty of Care and Education) Article 820 A person who exercises parental authority holds the right, and bears the duty, to care for and educate the child for the child's interests.[11]

The word translated as "care" in this Article is "*kango*" (監護). "*Kango*" is also commonly translated as "custody." For example, Article 766, cited above, uses "custody" for the translation of *kango*. Also, the Japanese translation of the Hague Convention Article 3(a), which states that removal of a child is wrongful when done "in breach of rights of custody," uses "*kango*" for "custody." Article 5(a) of the Hague Convention also uses "*kango*" for "custody," which defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." (Exhibit 16).

While *kangoken* is not defined in the Civil Code, it is generally understood that a parent with custody rights (*kangoken*) has the rights and duties set forth in Articles 820 (care and education), 821 (determination of residence), 822 (discipline), and 823 (permission for occupation). Rights of custody (*kangoken*) are rights to take daily care of children and exclude the right to administer the financial assets of the children.

In this case, Ms. Jung was appointed as the custodian (*kango-sha*) of the children pending finalization of divorce.

---

[10] *Kango* is made up of two kanji characters, "監" which means "oversee, rule, or administer," and "護" which means "safeguard, protect." *Kangoken* adds the same *ken* ("権") as in *shinken*, meaning "authority," "power," or "rights," and can be translated as custody rights or rights of custody.
[11] Japan Civil Code, Article 820. (Exhibits 11, A).

### D. Visitation Under Japanese Law

While historically there was no statute specifically addressing visitation rights in Japan, Article 766 was amended allowing "visitation and other contacts" [12] with the children by the non-custodial parent. [13] Prior to this amendment, Japanese courts had interpreted the "catch-all" provision in Article 766 to allow for visitation.

For example, the judgment of Tokyo Family Court dated December 14, 1964,[14] stated:

> Even if, due to the unfortunate event of the parents' divorce, it is impossible for the parents to jointly exercise parental authority or custody of the minor child, and therefore one parent is designated as the parent with parental authority or custody of the minor child, and the minor child is left in the care and nurturing of the other parent alone, the other parent without parental authority or custody has the right to interview or negotiate with the minor child and this right shall not be restricted or taken away so long as it does not prejudice the welfare of the minor child.

Many scholars also believe the parent without parental authority (*shinken*) has the right to interview or negotiate with the minor child, although the nature of those rights is still arguable among scholars.

In this case, Paragraph 3 of the Mediation Agreement grants Mr. Mitsugi visitation (*menkai-kōryū*) with the children. The experts disagree on whether this visitation (*menkai-kōryū*) is considered a custody right (*kangoken*) under Japanese law.

### E. "Parental Authority" After Divorce

As stated above, upon divorce parental authority (*shinken*) can no longer be exercised jointly. In that case, the sole parental authority holder (*shinken-sha*) shall be determined upon

---

[12] "Visitation" is *menkai* ("面会") and "contacts" is *kōryū* ("交流"). These are combined to refer to visitation as *menkai-kōryū*.

[13] Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 228–29 (2007). (Exhibit 15).

[14] Tokyō Katei Saibansho [Fam. Ct.] Dec. 14, 1964, Shō 39 (ka) no.10192, 17(4) Katei Saibansho geppō [Kagetsu], 55 (Japan). (Exhibit 17).

divorce by mutual agreement of the parents (Article 819(1) of the Civil Code) or by the judgment of a court (Article 819(2) of the Civil Code). Divorcing parents may also agree on visitation (*menkai-kōryū*) (Article 766(1) of the Civil Code), or the decision regarding visitation (*menkai-kōryū*) may be made by the court in cases where an agreement cannot be reached (Article 766(2) of the Civil Code).

At the conclusion of the divorce proceedings in Japan, the Japanese court will designate either Mr. Mitsugi or Ms. Jung as the sole parent with parental authority.

## IV.    DIFFERENT OPINIONS

As stated above, the Experts disagree on whether Mr. Mitsugi has the rights to see the children in Japan physically and whether Ms. Jung's move to the United States interferes with his rights and whether his rights are regarded as a custody right under Japanese law. We, Kaoru Haraguchi and Daniel Young, present our opinions on this issue separately below.

### A.  Kaoru  Haraguchi's Opinion[15]

### 1.  Introduction

As far as I know, there is no direct precedent nor prevailing opinion among scholars on the right of Mr. Mitsugi in this case.

Considering the best interests of the children, the guiding principle of the family law of Japan with respect to *kango* of the child, *menkai-kōryū* by the parent who is living separately from the children is critically important for the mental development of the children.  In this regard, *menkai-kōryūken* should be protected as much as possible in the interpretation of the laws of Japan.

---

[15] As mentioned above, *see* supra note 2, I do not believe there are any official translations of Japanese custodial clauses into English. For that reason, I will use the Japanese terms for each custodial right and provide detailed explanations of how they function in Japan in my separate opinion.

In consideration of the above, I opine that Ms. Jung's taking the children to the United States without Mr. Mitsugi's consent interferes with Mr. Mitsugi's *menkai-kōryūken*, which is regarded as included in the *kangoken* (and the right to determine the residence of the children, which should be *Kangoken)* under the laws and practice of Japan.

The following is a more detailed interpretation of Japanese law by myself.

**2. Rights Under the Mediation Agreement**

The first and the most important facts are the terms and conditions of mediation agreed by Ms. Jung and Mr. Mitsugi ("Mediation Agreement").

The original language of Paragraph 1 of the terms and conditions of the Mediation Agreement is as follows:

> 当事者双方は、離婚又は同居するまでの間、母である相手方を、
> 当事者双方の長男［KLM］…及び［RHM］…の監護者と定める。

My English translation of Paragraph 1 of the Mediation Agreement between Mr. Mitsugi and Ms. Jung is as follows: "Both parties appoint the other party, the mother, as *kangosha* of the parties' first son, KLM …  and second son, RHM …, until they divorce or live together."

Original language of Paragraph 3 of the terms and conditions of mediation is as follows:

> 相手方は、申立人に対し、申立人が第１項記載の子らとの面会交
> 流をすることを認め、その回数、日時、場所、方法等具体的内容
> については、子らの福祉を慎重に考慮し、当事者双方が事前に協
> 議して定める。

My English translation of Paragraph 3 of the Mediation Agreement is as follows: "The Respondent shall admit that the Petitioner has visitation with the children described in Paragraph 1, and the number of times, dates, places, methods, and other specific details of such visitation shall be determined through discussion before the visitation by both parties, carefully considering the welfare of the children."

This means that Mr. Mitsugi is *entitled* to visit the children and the specific details, including but not limited to, the number of times, dates, places, methods of transport, of such visitation shall be determined through mutual agreement.

After the Mediation Agreement, Mr. Mitsugi and Ms. Jung agreed by mutual consent that Mr. Mitsugi is entitled to see the children twice a month in person in Japan. Based on an agreement made between Ms. Jung and Mr. Mitsugi, Mr. Mitsugi started *menkai-kōryū* with the children in person in Japan from October, 2020 and continued *menkai-kōryū* for more than 20 times until Ms. Jung moved to the United States with the children without Mr. Mitsugi's consent.

### 3. *Menkai-kōryūken* Is Part of *Kangoken*

I believe Mr. Mitsugi's above rights from mediation are part of *kangoken* under the laws of Japan. This is because Mr. Mitsugi's *menkai-kōryūken* are not mere based on agreement, but the rights under the Article 766(1) of the Civil Code applied to this case *mutatis mutandis*.

The original language of Article 766(1) of the Civil Code is as follows:

> 父母が協議上の離婚をするときは、子の監護をすべき者、父又は母と子の面会及びその他の交流、子の監護に要する費用の分担その他の子の監護について必要な事項は、その協議で定める。この場合においては、子の利益を最も優先して考慮しなければならない。

My English translation of the above article is as follows:

> Upon the divorce of the father and mother by mutual consent, it is necessary for them to decide the person who should have custody of the child, visitation of the father or mother and other communication of the children, sharing of expenses required for the custody of the children and **other necessary matters concerning the custody of the children**. In such cases, the interests of the child shall be given the top priority.

(emphasis added).

It should be noted that the necessary matters concerning *kango* of the children can be decided by the father and mother under Article 766(1) of the Civil Code. It is also noted that the

content of *menkai-kōryū*, such as the place and duration, can be decided even if one of the father or mother is appointed as *kangosha* of the children and the other is not. Furthermore, *menkai-kōryūken* is regarded as the necessary matter concerning the custody of the child.

Article 766(1) determines the custodial arrangement of parents upon divorce, but separation is like divorce in that parents live separately and only one of the parents would normally live together with the children. Therefore, Japanese courts apply the Article 766(1) *mutatis mutandis* to separation before divorce.[16]

> *Mutatis mutandis* application of the above article to separation can be as follows:
>
> Upon the separation before the divorce of the father and mother, it is necessary for the them to decide the person who should have custody of the child, visitation of the father or mother and other communication of the children, sharing of expenses required for the custody of the children and **other necessary matters concerning the custody of the children**. In such cases, the interests of the child shall be given the top priority.

(emphasis added).

As mediation is based on the *mutatis mutandis* application of Article 766(1) of the Civil Code, the above characteristics of Article 766(1) shall be applicable to the separation before divorce.

More precisely, this means that the necessary matters concerning *kango* of the children can be decided by the father and mother. The content of *menkai-kōryū*, such as the place and duration, can be decided even if one of the father or mother is appointed as *kangosha* of the children and the other is not.

In this case, Ms. Jung and Mr. Mitsugi agreed in front of the mediation panel held in the Chiba District Court by *mutatis mutandis* application of Article 766(1) of the Civil Code. Mr.

---

[16] *Supra* note 8.

Mitsugi is therefore entitled to see his Children twice a month for a couple of hours in Japan after the separation but before the divorce, even though Ms. Jung is appointed as *kangosha* under Article 766(1) of the Civil Code of Japan. In other words, Mr. Mitsugi's *menkai-kōryūken* is regarded as part of *kangoken*, determined and given under the Article 766(1) *mutatis mutandis* application.

Because Mr. Mitsugi could not see the children twice a month in person after Ms. Jung's moving to the United States with the children, Ms. Jung's moving is interference with Mr. Mitsugi's *menkai-kōryūken*, which is part of the *kangoken* of Mr. Mitsugi under *mutatis mutandis* application of Article 766(1) of the Civil Code.

Although it is not direct precedent where *kangosha* of the children had not yet appointed after the separation, the Supreme Court of Japan held:

> **During the marriage of the parents**, the parents jointly exercise *shinken*, and **the person with *shinken* has the rights and the obligations to take care of and educate the children** (Article 818(3) and 820 of the Civil Code). Even if the marriage has broken down and the parents live separately, **it shall be a part of taking care and education that the parent who is not living with the child visits the child.** [17]

(Emphasis added). Here, the Supreme Court of Japan expressly states that *menkai-kōryū* by the *hi-kangosha* during separation is a part of taking care and education, which is *kango*.

I believe the above principle held by the Supreme Court of Japan shall be applicable to this case as Mr. Mitsugi is entitled to see the children Ms. Jung is appointed as *kangosha* at the same time when Ms. Jung is appointed as *kangosha* under Paragraphs 1 and 3 of the Mediation Agreement in accordance with Article 766(1) of the Civil Code.

---

[17] *Id.*

Accordingly, I conclude that Ms. Jung's taking the children from Japan for permanent residence in the United States interferes with Mr. Mitsugi's *kangoken* under the Mediation Agreement based on the *mutatis mutandis* application of Article 766(1) of the Civil Code.

### 4. Rebuttal to Mr. Young's Opinion

The following are my opinions towards the arguments put forward by Mr. Young's Opinion:

#### (1) *Menkai-kōryū* Is Part of *Kangoken*

Mr. Young believes that *menkai-kōryū* is not *kangoken* under Japanese law.

While it is true that *kangoken* includes the right to care for and educate the child (Article 820), determine the residence of the child (Article 821), discipline the child (Article 822), and give permission for the child to work (Article 823), none of these Articles discuss *menkai-kōryūken* during separation or after divorce. Article 766(1) of the Civil Code, however, discusses *menkai-kōryū* in the context of the determination of the *kangosha* between parents upon the divorce and separation before the divorce (through *mutatis mutandis* application).

As I mentioned above, Mr. Mitsugi is entitled to see the children in accordance with the above specific details determined through mutual agreement pursuant to Paragraph 3 of the Mediation Agreement, and Mr. Mitsugi and Ms. Jung agreed that Mr. Mitsugi is entitled to see the children twice a month in person in Japan, which means that Mr. Mitsugi has *menkai-kōryūken* under Japanese law. As stated above, in addition, the Supreme Court held that *menkai-kōryū* is a part of taking care and education, which is *kango*.

### (2) Menkai-kōryūken Is Enforceable (*at least indirectly*)

Mr. Young claims that Mr. Mitsugi's *menkai-kōryūken* is not enforceable under the laws of Japan.

It is true that *menkai-kōryū* is not enforceable physically and directly by the enforcement officer of the court under the laws of Japan. However, Mr. Mitsugi could file the petition for enforcement of the Mediation Agreement with the court and Ms. Jung would be required to pay the monetary sanction until the commencement of *menkai-kōryū* under Article 172(1) of the Civil Execution Act of Japan.[18]

Article 172(1) of the Civil Execution Act provides:

> Compulsory execution for an obligation of action or inaction for which it is not possible to carry out the compulsory execution set forth in paragraph (1) of the preceding Article[19] shall be carried out by the method in which the execution court orders the obligor to pay to the obligee money of a certain amount that is found to be reasonable for securing performance of the obligation, according to the period of the delay or immediately if the obligor fails to perform the obligation within a certain period that is found to be reasonable.

Mr. Mitsugi also could file a damage claim against Ms. Jung for his emotional damage for not seeing the children with the court.[20]

---

[18] Saikō Saibansho [Sup.Ct.] Mar. 28, 2013, Hei 24 (kyo) no.48, 67(3) Saikō Saibansho minji hanreishū [Minshū], 864 (Japan). (Exhibit B).

[19] Article 171(1) of the Civil Execution Act provides: Compulsory execution set forth in the following items is carried out by the procedure in which the execution court issues an order as specified respectively in those items: (i) compulsory execution of an obligation of action: an order causing a third party to perform the action at the expense of the obligor; and (ii) compulsory execution of an obligation of inaction: an order directing the removal of the outcome of the action performed by the obligor, or an appropriate ruling against any future action, at the expense of the obligor. (Exhibit A).

[20] *See e.g.* Kumamoto Chihō Saibansho [Dist. Ct.] Dec. 27, 2016, Hei 27 (wa) no.640, LLI/DB L07151144 (Exhibit C); Shizuoka Chihō Saibansho [Dist. Ct.] Hamamatsu Shibu Nov. 21, 1999, Hei 10 (wa) no.548, 1713 Hanrei Jihō, 92. (Exhibit D).

In other words, the rights of Mr. Mitsugi are indirectly enforceable under the laws of Japan. Under the Civil Execution Act, this method of enforcement is called as 間接執行 or *indirect enforcement.*

**(3) Kangosha Can Be Changed to Mr. Mitsugi and Mr. Mitsugi Should be *Shinkensha***

Mr. Young also claims that as the children have been living with Ms. Jung and the court has already approved Ms. Jung as the *kangosha* of the children pending the finalization of the divorce based on the agreement of the parties, it is most likely that Ms. Jung will be given sole *shinken* upon finalization of the divorce. He then claims that once the divorce is finalized, Ms. Jung will most likely could determine the residence of the children without any input from Mr. Mitsugi.

First of all, however, *shinken after* divorce has nothing to do with and does not affect what rights Mr. Mitsugi as *hi-kangosha* has *menkai-kōryūken before* divorce, which is the key issue to be addressed here. The *kangosha* will only be fully determined after Mr. Mitsugi and Ms. Jung divorce.

While Ms. Jung is currently appointed as *kangosha* of the children, this is a status that may be changed by the family court. Article 766(3) provides: "The family court may change the agreement or determination under the provisions of the preceding two paragraphs and order any other proper disposition regarding custody over the child, if it finds this necessary." In this regard, the Fukuoka High Court made a notable decision.[21] This case is related to the removal of the children by the mother from Japan to the United States without the consent of the father while the

---

[21] Fukuoka Kōtō Saibansho [High. Ct.] Feb. 23, 2010, 63(1) Katei Saibansho geppō [Kagetsu], 134 (Japan). (Exhibit E).

father's petition for the change of the *shinkensha* of the children from the mother to the father is pending.

The Fukuoka High Court affirmed the change of the *shinkensha*, holding that the mother took the minors, who had been living together with the father and leading a stable life, to a country unknown to the minors, against the father's wishes and in disregard of the pending proceedings, which caused serious doubts about the mother's eligibility as *shinkensha*. The removal during the pending petition of the change of the *shinkensha* was a clear abuse of the mother's right to determine the residence of the child, which should be one of the reasons why the court orders the change of the (*shinkensha* in this case.

The same holding applies when determining whether to change the *shinkensha* and *kangosha*).[22] Therefore, even though Mr. Mitsugi is a parent who has *menkai-kōryūken* and did not live with the children prior to their removal from Japan, interference with *menkai-kōryū* such as taking the children to a foreign country without Mr. Mitsugi's consent in violation of the Mediation Agreement also may prevent the children from leading stable lives in which they have the opportunity to see both parents.

If the *kangosha* changed from Ms. Jung to Mr. Mitsugi, Mr. Mitsugi is most likely to be appointed as *shinkensha* of the children for the sake of the best interests of the children.

**(4)  Mr. Mitsugi Has the Right to Determine the Residence of the Children**

Mr. Young believes that Ms. Jung has the authority to determine the residence of the child without consent of Mr. Mitsugi as she was appointed as *kangosha* under the Mediation Agreement.

Mr. Mitsugi, however, still holds  the right to determine the residence of the child in order to fully have *menkai-kōryū* with the children as agreed with Ms. Jung in accordance with Paragraph

---

[22] Ichiro Shimazu and Toru Abe, *Shinpan Chūshaku Minpō* (22) [New Commentary on the Civil Code (22)] 124 (2008). (Exhibit F).

3 of the Mediation Agreement. In other words, Mr. Mitsugi has the right to determine the residence of the child to prevent Ms. Jung from interfering with *menkai-kōryū* with the children.

When *kangosha* determines the residence of the child in a manner which interferes with *menkai-kōryū*, therefore, such exercise of the right to determine the residence of child should be understood to be abuse or improper. In such case, the determination of residence of the child by *hi-kangosha* serves the children's best interest. To put it another way, *hi-kangosha* should be able to exercise the right to consent or object to determination of residence of the child by *kangosha*.

I therefore conclude that Ms. Jung's taking the children to the United States without Mr. Mitsugi's consent is interference with not only his visitation rights under Article 766(1) of the Civil Code of Japan but also his right to determine the residence of the children under Article 821(1) of the Civil Code of Japan.

## 5. Conclusion

I conclude that Mr. Mitsugi is entitled to see the children the under Article 3 of the Mediation Agreement in accordance with Article 766(1) of the Civil Code of Japan which is applicable to this case *mutatis mutandis.* Even though Ms. Jung was appointed as *kangosha* of the children under the Mediation Agreement before the divorce, Mr. Mitsugi still holds *menkai-kōryūken* which entitles him to be with his children twice a month each for a couple of hours in Japan agreed between Ms. Jung and Mr. Mitsugi in accordance with Paragraph 3 of the Mediation Agreement. This *menkai-kōryūken* given by the mediation to Mr. Mitsugi is, in my opinion, part of Mr. Mitsugi's *kangoken* under the laws of Japan as supported by the above Supreme Court

decision on May 1, 2000[23]. Mr. Jung's move to the United States with the children is therefore infringe of *Kangoken* of Mr. Mitsugi under Article 766(1) of the Civil Code of Japan.

Mr. Mitsugi also still holds the right to determine the residence of the children to prevent Ms. Jung from interfering with *menkai-kōryū* with the children after Ms. Jung is appointed as *kangosha* of the children and could determine the location of the children unless she interfere with Mr. Mitsugi's visitation of the children. Ms Jung's move to the United States with the children without consent of Mr. Mitsugi causing Mr. Mitsugi not to see the children in Japan in person physically is infringement of Mr. Mitsugi's still holding rights under Article 821 of the Civil Code of Japan, which is his *kangoken (and Shinken)* under the laws of Japan.

### B. Daniel Young's Opinion

Respondent Eunji Jung was appointed as the sole custodian[24] (*kango-sha*) of the children in the Mediation Agreement that was approved and signed by the mediation panel of the Chiba Family Court on August 13, 2020. *See* Mediation Agreement, ¶ 1 (Exhibit 7). In the Mediation Agreement, Ms. Jung agreed to allow the Petitioner Robert Ryuichi Mitsugi to have visitation with the children at dates, times, methods, and locations that would be agreed to by the Parties. *See* Mediation Agreement, ¶ 3 ("The other party [Ms. Jung] allows the Petitioner [Mr. Mistugi] to meet and interact with the children … with the number, date, place, method, etc. that both parties discuss and decide in advance.") (Exhibit 7). As the custodian of the children under Japanese law, Ms. Jung had the authority to determine the children's place of residence without input from Mr. Mitsugi. Visitation is not a "custody right" under Japanese law. Even if that were not the case,

---

[23] *Supra* note 15.
[24] Mr. Haraguchi added an objection to this term in the final exchange of drafts. "Sole custodian" is a term he used in his own writings (*see* Exhibit 12) and did not object to in numerous exchanges of drafts. It is undisputed that only Mr. Jung was appointed as *kangosha* and that Mr. Mitsugi was not appointed *kangosha*. Therefore the term "sole custodian" is appropriate.

however, Mr. Mitsugi was not entitled to visitation *in Japan*. In the Mediation Agreement, the Parties agreed to discuss and agree upon dates, times, and locations of Mr. Mitsugi's visitation. Visitation is still occurring through telephone and video chats. If the Parties could not agree, then Ms. Jung as the sole custodian of the children does not need to allow visitation. Mr. Haraguchi provides no support for his opinion that Ms. Jung could not decide the residence of the children, that his visitation had to occur in Japan, or in person more generally.

### 1. Japan does not recognize joint custody

As discussed above, the Civil Code provides that married parents exercise parental authority (*shinken*) over their children jointly. *See* Civil Code, Article 818 (Exhibit 11). Upon divorce, only one parent can exercise parental authority (*shinken*). *See* Civil Code, Article 819 (Exhibit 11). Because only one parent has parental authority after divorce, Japan does not recognize "joint custody" as understood by U.S. Courts. As applied to this case, once the divorce is finalized in Japan, only one of Ms. Jung or Mr. Mistugi will exercise parental authority with regard to the children. As Ms. Jung has been appointed the sole custodian (*kango-sha*) of the children, it is almost certain that Ms. Jung will be appointed as the sole parent with parental authority (*shinken*) in the Japanese divorce proceedings. This is supported by the Osaka Family Court decision stating that the preference is to have *shinken* and *kangoken* "unified sooner or later" in the same person. [25] Further, the investigators for the Family Court also recommended that Ms. Jung be the custodian and the Court will likely follow that recommendation. [26] The literature also shows that in practicality, the parent with *kangoken* will be awarded *shinken* upon divorce. [27] Mr.

---

[25] Ōsaka Katei Saibansho [Fam. Ct.] Jan. 16, 1980, Shō 55 (ka) no.1696, 22(11) Katei Saibansho geppō [Kagetsu], 55 (Japan). (Exhibit 18).

[26] *See* Due Diligence Report (Exhibit 3).

[27] *See e.g.*, Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 217 (2007). (Exhibit 15).

Haraguchi's prior writings also acknowledge Japan's "emphasis on the continuity of the custodial circumstances."[28] Japan generally favors that one parent have custody over the child and that interaction with the non-custodial parent be limited.[29] Once Ms. Jung is given sole parental authority, Ms. Jung would be able to decide the residence of the children regardless of whether Mr. Mitsugi objects.

However, the divorce in Japan is not finalized, this case involves the period between separation and divorce. Because the parents are not divorced, they both can exercise parental authority (*shinken*). However, one parent (Ms. Jung) has been designated as the custodian (*kango-sha*) and has custodial rights (*kangoken*). As discussed above, custody rights include the rights and duties set forth in Articles 820 (care and education), 821 (determination of residence), 822 (discipline), and 823 (permission for occupation) (Exhibit 11). Ms. Jung can exercise these custody rights (*kangoken*) as the custodian (*kango-sha*) of the children. As the non-custodial parent,[30] Mr. Mitsugi still has rights regarding the property of the children. Mr. Mitsugi agreed to this. When custodial rights (*kangoken*) have been separated from parental authority (*shinken*) as in this case, custody rights are more akin to "physical custody"[31] in the U.S. and Mr. Mitsugi's parental

---

[28] Kaoru Haraguchi, *Child Abduction and Article 224 of the Criminal Code of Japan (Minor Kidnapping)*, February 2, 2019 (Exhibit 12).

[29] *See* Taria Cajudo, *Japan's Failure to Protect Japanese-American Children from International Parental Kidnapping in Violation of the Hauge Convention on Child Abductions*, 33 Am. U. Int'l L. Rev. 477, 483-85 (2017) (Exhibit 19); Horvath & Ryznar, *Protecting the Parent-Child Relationship*, 47 Geo. Wash. Int'l L. Rev. 303, 316–317 (Exhibit 20); Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 236 (2007) ("there is also the argument that visitation, where a parent who is not part of the child's everyday life has sporadic contact, is undesirable and destroys the continuity of the [custodial] parent-child bond.") (Exhibit 15).

[30] Mr. Haraguchi uses the term *hi-kangosha*. The "*hi*" is 非, a character meaning "negative, non" showing that Mr. Mitsugi is the non-custodial parent, or the parent without *kango*.

[31] Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 215-16 (2007). (Exhibit 15).

authority (*shinken*) is more akin to "legal custody"[32] in the U.S. "When separated from *kangoken, shinken* does not include authority over education, the right to participate in deciding where a child will live, visitation rights, or even the right to know where the child is living or going to school."[33] Further, the Osaka Family Court has stated that "since separation of parental rights and custody is not the best, it is reasonable to allow the person qualified for custody to exercise not only custody but also parental rights, unless there are special circumstances …."[34] Ms. Jung was the parent qualified for custody and can exercise her full parental authority. Thus, when "custody" is separated from "parental authority" in this manner, the parent with "custody" (*kangoken*), is the parent that can determine the residence of the child.

Such a separation of "parental authority" and "custody" occurred in this case pending finalization of the divorce and Ms. Jung was appointed as the sole custodian. She was also designated as the head of household on her Residence Certificate. This reflects Japan's preference that the children have one person that takes care of the children and that having a non-custodial parent overly involved with the children is not in the best interests of the child.[35]

As the sole custodian and head of household, Ms. Jung could designate the children's residence under Japanese law without input from Mr. Mistugi. Mr. Mitsugi retained some aspects of "parental authority," namely the right to give permission for the children to work and the right

---

[32] *See e.g.*, Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 213-14 (2007). (Exhibit 15).

[33] Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 213-14 (2007). (Exhibit 15).

[34] Ōsaka Katei Saibansho [Fam. Ct.] Jan. 16, 1980, Shō 55 (ka) no.1696, 22(11) Katei Saibansho geppō [Kagetsu], 55 (Japan). (Exhibit 18).

[35] *See* Osaka Family Court decision cited above (Exhibit 18) and Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 236 (2007) ("In addition, there is also the argument that visitation, where a parent who is not part of the child's everyday life has sporadic contact, is undesirable and destroys the continuity of the [custodial] parent-child bond. This argument is based on research in family psychology and psychoanalysis that shows that it is a fundamental necessity for a child's healthy development that the [custodial] parent-child bond be stable and continuous.") (Exhibit 15).

to administer their property, but he did not have any right to determine the residence of the children, or object to Ms. Jung's choice of residence.[36] While Ms. Jung has the authority under Japanese law to unilaterally determine the residence of the children, she consulted with Mr. Mitsugi, considered his position, but ultimately decided it was in the best interests of the children to live with her in New York. This was her right as the custodian under the Mediation Agreement.

### 2. Ms. Jung has complied with the visitation in the Mediation Agreement

Mr. Haraguchi's opinion is that Mr. Mitsugi is *entitled* to visitation in Japan under the Mediation Agreement and that the move to the United States interfered with that visitation. Mr. Haraguchi provides no support for his opinion that Mr. Mitsugi is *entitled* to visitation *in Japan*. The plain language of the Mediation Agreement states that the parties will "discuss and decide in advance" the number of times, dates, places, and methods of visitation. There is nothing in the Mediation Agreement requiring visitation to occur face-to-face physically in Japan. Further, there are no communications or other documents evidencing that such an agreement was made. Instead, the documentary evidence shows that Ms. Jung notified Mr. Mitsugi of her intent to move to the United States, discussed the matter with Mr. Mitsugi, and considered his opinions but ultimately decided it was in best interests of the children to live with her in the United States. Importantly, visitation has continued at times and methods agreed to by Ms. Jung and Mr. Mitsugi through telephone calls and video conferencing. An invitation to visit in the U.S. was extended as well. Thus, it does not appear that there has been any violation of Paragraph 3 of the Mediation Agreement.

---

[36] *See e.g.*, Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 217-18 (2007) ("An award of kangoken to one parent effectively empowers that parent to completely exclude the non-custodial parent from all aspects of their child's upbringing and day-to-day life. While the non-custodial parent may retain hypothetical rights as a joint legal custodian prior to divorce, in practice, such rights are largely meaningless.") (Exhibit 15).

I also disagree with Mr. Haraguchi's translation of Paragraph 3 of Mediation Agreement. He says Ms. Jung "shall admit the Petitioner has visitation …." The certified translation states that "The other party [Ms. Jung] allows the Petitioner to meet and interact with the children …."[37] In my opinion, the translation stating Ms. Jung "allows" visitation is more accurate than Mr. Haraguchi's translation stating Ms. Jung "admits" visitation.

The word translated as "allows" is "mitomeru" (認める), which means "to approve, to deem acceptable, to allow."[38] "Mitomeru" can also mean "to admit, to accept, to confess (to a charge)."[39] However, in the context of Ms. Jung being appointed the sole custodian and having *kangoken*, I believe the use of "allows" in the certified translation is more appropriate. The use of the word "mitomeru" shows that Ms. Jung did not need to agree to visitation, but allowed it or accepted it in her discretion as part of the court mediation process, not that she was admitting Mr. Mitsugi had a custody right. Even though Mr. Mitsugi can visit the children, it must be agreed to by Ms. Jung as reflected in the Mediation Agreement.

### 3. Visitation is not a custodial right under Japanese law

Mr. Haraguchi opines that Mr. Mitsugi is *entitled* to visitation in Japan. I disagree with the use of the term *entitled*. Mr. Jung agreed to allow visitation, it is not a right to which Mr. Mitsugi is entitled.

Mr. Mitsugi mainly relies on the Mediation Agreement to support this entitlement. As discussed above, Mr. Jung has fulfilled her obligations under the Mediation Agreement. The issue becomes what visitation rights does Mr. Mitsugi have if they cannot agree under the Mediation Agreement. Under Japanese law, Mr. Mitsugi does not have an enforceable custodial right.

---

[37] Mediation Agreement, ¶ 3 (Exhibit 7).
[38] *See https://jisho.org/search/mitomeru* entry 3 (last visited April 4, 2023) (Exhibit 21).
[39] *See id.* entry 4.

Visitation is not a right under Japanese law. As discussed above, Japan is a civil law country, meaning court decisions are not precedential. The Civil Code is the source of law. There is no provision in the Civil Code requiring visitation or recognizing it as a right to a non-custodial parent. Article 766 allows the parties to agree to visitation and the court to order it if the parties do not agree, but it does not make it a right. As set forth in the joint opinion, visitation (*menkai-kōryū*) is not a part of parental authority (*shinken*) or the aspects of parental authority that make up custody rights (*kangoken*). Thus, it is not a right under the Civil Code. I think it is also interesting to note that *shinken* and *kangoken* both use "*ken*" meaning "right," but "*ken*" is not used with visitation (*menkai- kōryū*).

The fact that it is not a right also evidenced by the fact that there is no direct enforcement mechanism for visitation. "[I]n general the courts do no follow-up on the visitation agreements they broker. Furthermore, by this point in the proceedings, everyone involved in the process should be aware that any agreement on visitation is unenforceable."[40] Mr. Haraguchi cites some possible ways to punish Mr. Jung, but none of those methods will force visitation. His claim that Mr. Mitsugi could win a case appointing himself as custodian while technically possible is entirely speculative and contrary to his prior pronouncements on the matter.[41] As Japanese courts tend to favor continuity of custody, Mr. Mitsugi's chances of prevailing in such a case are entirely slim and does not negate that Ms. Jung was the legally appointed custodian when she moved.

His reliance on the 2000 Supreme Court case is also misplaced. "While the 2000 Decision clarified the procedural status of visitation, particularly in cases of separation before or without

---

[40] Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 239 (2007). (Exhibit 15).
[41] *See* Kaoru Haraguchi, *Child Abduction and Article 224 of the Criminal Code of Japan (Minor Kidnapping)*, February 2, 2019, (Exhibit 12) (recognizing that a custodial mother moving with the children without consent of the father is not recognized as criminal under Japanese law).

divorce, it also confirmed that visitation is not a substantive right that could be asserted by parents, either for their own sake or for the sake of their children."[42] The court recognized that visitation can be good for the care and education of the child under Article 820, but it did not bestow a custody right to non-custodial parents with visitation. Thus, Japan does not recognize visitation (*menkai-kōryū*) as a custodial right, even if it is good for children to visit with the non-custodial parent.

### 4. Conclusions of Daniel Young

In conclusion, it is my opinion that Ms. Jung was appointed as the sole custodian (*kanogsha*) of the children under Civil Code Article 766(1). As the sole custodian, she exercised custodial rights (*kangoken*). Those custodial rights (*kangoken*) include the ability to determine the residence of the children under Civil Code Article 821. As Mr. Mitsugi was not the custodian, he only maintained parental authority (*shinken*) over financial matters involving the children under Article 824. He does not have the authority to determine the residence of the child or interfere with the residence determined by the custodian. Mr. Mitsugi was allowed visitation (*menkai-kōryū*). He is participating in visitation, even with the children in the United States. Visitation is not a right under Japanese law and is not a custodial right.

Mr. Haraguchi states there is no direct precedent defining Mr. Mitsugi's rights under Japanese law and then proceeds to argue how he thinks Japanese law should be. However, under the practical application of Japanese law, Mr. Mitsgui does not have custody rights (*kangoken*). Those rights are held exclusively by Ms. Jung, the undisputed sole custodiain (*kangosha*) of the children.

---

[42] Colin P.A. Jones, *In the Best Interests of the Court: What American Lawyers Need to Know About Child Custody and Visitation in Japan*, 8 Asian-Pac. L. & Pol'y J. 166, 244–45 (2007). (Exhibit 15).

# V.  JOINT CONCLUSION

The Experts thank Your Honor for your consideration of our legal analyses and welcome any questions on both our joint and differing view**s.**

DATED this 5th day of April, 2023

/s/ Daniel E. Young
DANIEL E. YOUNG

/s/  Kaoru Haraguchi
KAORU HARAGUCHI